Lance Croffoot-Suede
D. Alison von Rosenvinge
Jared R. Jenkins
Linklaters LLP
1345 Avenue of the Americas
New York, NY 10105
(+1) 212 903 9000 (Tel)
(+1) 212 903 9100 (Fax)

Attorneys for Defendant

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

United States of America,

                         v.

Abass Gles,

                              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

07 Cr. 311-02 (DAB)

## AMENDED SENTENCING MEMORANDUM ON BEHALF OF ABASS GLES

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................. 1

    A.    Mr. Gles' Offense and Guilty Plea .......................................................... 1

    B.    Mr. Gles' Personal Background.............................................................. 2

ARGUMENT ......................................................................................................................... 4

I.      THE COURT HAS THE DISCRETION TO IMPOSE A FAIR SENTENCE. .................... 4

II.     THE FACTORS ENUMERATED IN 18 U.S.C. § 3553(A) SUPPORT
       A NON-GUIDELINES SENTENCE OF THE MANDATORY MINIMUM OF
       TWENTY-FOUR MONTHS.............................................................................. 6

    A.    Mr. Gles' Incarceration Already Has Caused Considerable Harm To
        His Family And The Longer He Remains Incerated The More His Family
        Will Be Harmed. ...................................................................................... 8

    B.    Mr. Gles' Incarceration Has Had A Serious Negative Impact On His
        Extended Family And Friends In the United States.................................. 11

    C.    Mr. Gles Has Demonstrated Remorse For His Actions And Is Not
        Likely To Commit A Crime In the Future................................................. 13

    D.    Serving The Two Year Mandatory Sentence Meets The Goals Of
        Just Sentencing. ..................................................................................... 14

CONCLUSION.................................................................................................................... 15

# TABLE OF AUTHORITIES

Page

## CASES

*Gall v. United States,*
128 S.Ct. 586 (2007) ............................................................................................4, 5

*Kimbrough v. United States,*
128 S.Ct. 558 (2007) ............................................................................................4, 5

*United States v. Alba,*
933 F.2d 1117 (2d Cir. 1991) ..................................................................................8, 9

*United States v. Barnett,*
398 F.3d 516 (6th Cir. 2005) ....................................................................................6

*United States v. Booker,*
543 U.S. 220 (2005) ................................................................................................4, 5

*United States v. Crosby,*
397 F.3d 103 (2d Cir. 2005) ....................................................................................4, 6

*United States v. Greene,*
249 F. Supp. 2d 262 (S.D.N.Y. 2003) ......................................................................8

*United States v. Johnson,*
964 F.2d 124 (2d Cir. 1992) ....................................................................................8

*United States v. Jones,*
No. 99 CR 338-05, 2003 WL 174312 (S.D.N.Y. Jan. 27, 2003) ..................................6

*United States v. Martinez,*
413 F.3d 239 (2d Cir. 2005) ....................................................................................6

*United States v. Mateo,*
299 F. Supp. 2d 201 (S.D.N.Y. 2004) ......................................................................8

*United States v. Tineo,*
No. 99 CR 948 (RWS), 2000 WL 759837 (S.D.N.Y. June 12, 2000) ..........................8

*United States v. Torres Teyer,*
No. 01 CR. 21 (GEL), 2006 WL 3511885 (S.D.N.Y. Dec. 6, 2006)..............................8

## STATUTES

18 U.S.C. § 1028A .............................................................................................1, 6, 14

18 U.S.C. § 1029(b)(2) ................................................................................................. 1, 6, 14

18 U.S.C. § 1349 ........................................................................................................... 1, 6, 14

18 U.S.C. § 3553(a) ................................................................................................... 1, 5, 7, 14

## **OTHER AUTHORITIES**

U.S. Sentencing Guidelines Manual § 5H1.6 (2007) ..................................................................... 8

## PRELIMINARY STATEMENT

Abass Gles, by his undersigned attorneys, Linklaters LLP, respectfully submits this Sentencing Memorandum (the "Memorandum"), and the attached exhibits, to assist the Court in determining his sentence.

Mr. Gles respectfully requests that the Court impose a sentence of twenty-four months resulting from the mandatory minimum required by 18 U.S.C. § 1028A. As detailed below, we respectfully submit that such a sentence is reasonable in light of the factors enumerated in 18 U.S.C. § 3553(a). In the alternative, Mr. Gles requests that the Court impose six months of home detention for the violations of 18 U.S.C. § 1349 and 18 U.S.C. § 1029(b)(2) after Mr. Gles has served the mandatory minimum of twenty-four months required by 18 U.S.C. § 1028A.[1]

### A.    Mr. Gles' Offense and Guilty Plea

Mr. Gles has been incarcerated since his arrest on January 23, 2007. Mr. Gles was charged with three counts, one each of Conspiracy to Commit Wire Fraud, 18 U.S.C. § 1349; Conspiracy to Commit Access Device Fraud, 18 U.S.C. § 1029(b)(2); and Aggravated Identity Theft, 18 U.S.C. § 1028A. Mr. Gles and two others ordered computers and other electronic equipment using stolen personal information and credit card numbers. Mr. Gles pled not guilty to all three counts on April 27, 2007.

On September 6, 2007, Mr. Gles reconsidered his plea and pled guilty to the three counts pursuant to a plea agreement signed on September 6, 2007 (the "Plea Agreement"). As set forth in the draft Presentence Investigation Report (the "PSR") prepared by the United States District Court for the Southern District of New York Probation Office (the "Probation Office"),

---

[1]    This alternative sentence of home detention as a condition of probation pursuant to 18 U.S.C. § 3561 would be a non-United States Sentencing Guidelines sentence.

Mr. Gles has zero criminal history points and is in a Criminal History Category of I. (PSR, at p. 4). He was not been convicted of a crime before this offense.[2]

The PSR sets out a United States Sentencing Guidelines ("Guidelines") range of 27-33 months beyond the mandatory two-year minimum for aggravated identity theft in violation of 18 U.S.C. § 1028A. Section 1028A carries with it a mandatory minimum sentence of two year's imprisonment that runs consecutive to any other term of imprisonment imposed. (PSR, at ¶ 59).

The defense respectfully submits that the Guidelines sentence in this case would result in a sentence against Mr. Gles that is greater than necessary to achieve the goals of sentencing – retribution, deterrence, incapacitation, and rehabilitation.

**B.    Mr. Gles' Personal Background**

When determining Mr. Gles' sentence, this Court can, and should, consider Mr. Gles' personal characteristics, the effect of his incarceration on his family, his remorsefulness, and the low probability that Mr. Gles will commit a future crime.

Mr. Gles is 29 years old. He is from Tema, Ghana, which is a poor neighborhood in the suburbs of Accra, the capital city. (PSR at ¶¶ 39-40).[3] His father, Mohammed Gles, died in December of 2000 from complications resulting from a hernia surgery. He was over 80 years old at the time of his death. He was a trader who sold religious items. (PSR at ¶ 40). His mother, Jazatu "Lami" Adamu, still lives in Ghana. She is 52 years old and is unable to work a steady job because she has epilepsy. (*Id.*; Exh. D, Jazatu Abamu Letter; Exh. E, Dr. Samule Odonkor Letter). Mr. Gles' brother, Mohammed Misbawu, is twenty-four years old and, until

---

[2]    According to the PSR, Mr. Gles had taken part in the Bergen County pretrial diversion program after he was charged with Theft by Deception; Forged Writing, Obstructing Administration of Law; and Criminal Attempt Theft by Deception. Mr. Gles had nearly completed his term in the diversion program when he was arrested for the current crime. A bench warrant was issued when Mr. Gles missed a court appearance because he was incarcerated in New York.

[3]    All exhibits will be referred to first by the exhibit letter and then by the name of the exhibit. When appropriate, page or paragraph numbers will be provided.

recently, attended college in Ghana. Mr. Gles also has a younger sister, Sharifa, who recently graduated from high school in Ghana. (PSR at ¶ 39; Exh. G, Mohammed Misbawu Letter).

Mr. Gles comes from a loving, but very poor, family. "[P]overty was the biggest issue within [his] family," he has said. (PSR at ¶ 40). While his family always had the basics, their living conditions were difficult. The family of five shared a one-bedroom apartment with two other extended family members. The family's precarious situation deteriorated when Mr. Gles' elderly father died. Mr. Gles' mother, Jazatu Adamu, suffers from a form of epilepsy known as grand mal. (Exh. E, Dr. Samuel Odonkor Letter). It is the severest type of epilepsy and results in seizures that last for minutes and occasionally causes her to lose consciousness. While preparing dinner over an open fire one night, she was struck by a seizure. As she fell, the left side of her face was burned badly and she remains disfigured to this day. These seizures can be triggered by stress. Mr. Gles was initially reluctant to tell his mother about his arrest and incarceration because he worried the news would cause a seizure.

As the eldest son, Mr. Gles assumed responsibility for providing for his family after his father's death. Faced with stark prospects in Ghana, Mr. Gles made the difficult decision to move to the United States at the age of 19. The costs of Ms. Jazatu's continuing medical treatment were a major factor in Mr. Gles' decision to come to the United States. (Exh. E, Dr. Samuel Odonkor Letter). Even though he knew he would not see his family for a long period of time, he felt it was his duty to provide his family with more financial assistance than would be possible if he stayed in Ghana. After arriving in the United States, he worked "off-the-books" at a Ritz store in The Bronx, making $225 per week. (Exh. B, PSR at ¶ 52). He would send at least $50 per week back to Ghana, oftentimes more than that depending on his other expenses.

3

Mr. Gles was employed steadily since moving to the United States. He gradually increased his earnings in a series of service-industry positions. After moving to New Jersey in 2005, he worked at Wendy's making $8 per hour. He then worked at Home Depot in Hillside, New Jersey stocking shelves for $10 per hour. In May of 2006, he transferred to a seasonal job with a contractor who serviced Home Depot stores in New Jersey because the position paid $11 an hour. Unfortunately, that job was also more volatile. He had to quit in November of 2006 when his work schedule changed, forcing him to choose between continuing his education and keeping his job. (PSR at ¶ 49).

Mr. Gles also cares for and supports his wife, Tracey Oppong, who suffers from lupus. Mr. Gles and Ms. Oppong married in June of 2004. Ms. Oppong has trouble maintaining steady employment because she is often hospitalized for lupus-related complications. She works at sporadic temporary jobs. She is currently an office manager for a restaurant in White Plains. (PSR at ¶ 42). Mr. Gles has cared for Ms. Oppong since they were married. As she says, "he is always there for me." (PSR at ¶ 43). Mr. Gles has continued to provide financial support to his family in Ghana while also providing for his wife.

## ARGUMENT

## I.     THE COURT HAS THE DISCRETION TO IMPOSE A FAIR SENTENCE

The Supreme Court recently reiterated the advisory nature of the U.S. Sentencing Commission Guidelines in *Gall v. United States*, 128 S.Ct. 586 (2007) and *Kimbrough v. United States*, 128 S.Ct. 558 (2007). These two cases extended the line of cases that return sentencing discretion to the trial courts. *See United States v. Booker*, 543 U.S. 220 (2005); *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). A sentencing court is no longer bound by the sentence

4

calculated in accordance with the Guidelines and may impose a sentence less than that recommended by the Guidelines if it is sufficient to carry out the law.

In *Gall*, the Supreme Court stated that the Guidelines should be the starting point for the district court to calculate a sentence and not the only consideration. *Gall*, 128 S.Ct. at 596. The Court went on to state, "[T]he district judge...may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." *Gall*, 128 S.Ct. at 596-97. Courts must continue to consider all of the factors listed in section 18 U.S.C. § 3553(a) when determining a defendant's sentence rather than solely looking at the sentencing range pursuant to the Guidelines.[4] In *Kimbrough* the Court calls this an "overarching provision," and emphasizes that § 3553(a) "permits the court to tailor the sentence in light of other statutory concerns as well." *Kimbrough*, 128 S.Ct. at 570 (quoting *Booker*, 543 U.S. at 245-46).

Under section 3553(a), courts should consider a variety of factors, including the nature and circumstances of the offense and the history and characteristics of the defendant, whether the sentence will afford adequate deterrence to criminal conduct, and whether the sentence will protect the public from further crimes of the defendant.

---

[4] Section 3553(a) provides that the court, in determining the particular sentence to be imposed, shall consider--
(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed--

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for--

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines...
(5) any pertinent policy statement...
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

5

This two-step sentencing process – considering the Guidelines and then independently looking at the 3553(a) factors – gives courts greater discretion when determining the appropriate sentence in a case. *Gall*, 128 S.Ct. at 594; *Kimbrough*, 128 S.Ct. at 574; *Booker*, 543 U.S. at 256; *Crosby*, 397 F.3d at 110-13; *see also United States v. Martinez*, 413 F.3d 239, 243 (2d Cir. 2005) ("[J]udges imposing sentence in accordance with *Booker* may exercise greater discretion than they could have exercised under the pre-Booker regime."); *United States v. Barnett*, 398 F.3d 516, 528 (6th Cir. 2005) ("Under the new post-Booker framework, the district court is empowered with greater discretion to consider the factors provided in 18 U.S.C. § 3553(a) in determining a proper sentence."). To assist this determination, a court is entitled to find "all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence." *Crosby*, 397 F.3d at 113.

For the reasons set forth more fully below, and in light of the fact that this Court may impose a materially different sentence than a Guidelines sentence, the defense respectfully requests that the Court impose a non-Guidelines sentence of twenty-four months resulting from the mandatory minimum required by 18 U.S.C. § 1028A. In the alternative, if the Court imposes a Guidelines sentence, the defense respectfully requests a sentence at the lowest end of the Guidelines range.

## II.    THE FACTORS ENUMERATED IN 18 U.S.C. § 3553(a) SUPPORT A NON-GUIDELINES SENTENCE OF THE MANDATORY MINIMUM OF TWENTY-FOUR MONTHS

While Mr. Gles' Guidelines range set out in his PSR is 27 to 33 months in addition to the mandatory minimum of two years imprisonment, the factors in section 3553(a) demonstrate that the mandatory minimum sentence of twenty-four months is reasonable in light of Mr. Gles' situation. In the alternative, Mr. Gles respectfully submits that a sentence of six

months of home detention after serving his mandatory minimum of twenty-four months is sufficient to achieve the goals of § 3553(a).[5]

The Guidelines range set out in the PSR adds a two-level increase to the loss amount set out in the Plea Agreement. (Plea Agreement, at p. 3 and PSR at ¶ 59). The Plea Agreement stipulates a loss amount of more than $120,000, which carries with it a 10-level increase pursuant to § 2B1.1(b)(1)(F) of the Guidelines. The Probation Office has ignored the loss amount in the Plea Agreement and instead has calculated its own loss amount of $211,578.80, which carries with it a 12-level increase pursuant to the Guidelines. (PSR at ¶¶ 8-17, 24, 59, 70). Despite Mr. Gles' requests, the Probation Office has not provided Mr. Gles any evidence that supports its calculation or methodology. (Exhs. A and B, Objections to PSR). Mr. Gles has no way to verify—or challenge—these numbers. Given the lack of verifiable evidence to support this 2-level increase, the Defense requests that the Court rely on the loss amount stipulated in the Plea Agreement rather than the unsupported and unchallenged calculations in the PSR. If the Court decides that a sentence in accordance with the Guidelines is appropriate, a sentence at the lowest end of the Guidelines range set out in the Plea Agreement—that is, twenty-one months—is reasonable for a defendant such as Mr. Gles who (a) grew up in impoverished circumstances; (b) had a less than substantial role in the conspiracy; (c) has made efforts to rehabilitate his behavior; and (d) is unlikely to ever commit a crime again. *See United States v. Jones*, No. 99 CR 338-05 (RWS), 2003 WL 174312 (S.D.N.Y. Jan. 27, 2003).

At the time of this submission, Mr. Gles has already spent nearly fifteen months in prison. This time has been extremely difficult for Mr. Gles' family and friends, located both

---

[5]      Mr. Gles recognizes that pursuant to his Plea Agreement, he may not seek a downward departure from the Guidelines range stipulated in the Plea Agreement. However, the Plea Agreement specifically provides that he is entitled to argue for a sentence below the applicable Guidelines range pursuant to 18 U.S.C. § 3553(a). (Plea Agreement, at p. 4). (stating that "the parties agree that either party may seek a sentence [above or below] the Stipulated Guidelines Range...based upon the factors to be considered in imposing a sentence pursuant to [18 U.S.C. § 3553(a)]").

here and abroad. The eleven letters submitted to the Court on Mr. Gles' behalf are a testament of his commitment to his wife, his mother, his younger brother and sister, his extended family and friends. These letters also make it clear that Mr. Gles' strong network of family and friends do not condone Mr. Gles' crimes. Once Mr. Gles has served his sentence, his circle of family and friends expect him to lead a productive and crime free life.

18 U.S.C. § 3553(a) instructs the Court to consider factors that the Guidelines do not address, including the defendant's history and personal characteristics as well as the need to protect the public from any further crimes. Mr. Gles' personal history and his character weigh in favor of a reduced sentence of home detention: Mr. Gles is a primary caregiver for his wife, who has lupus; he is the primary financial provider for his wife, his mother, and younger brother and sister; and he is a critical member of his extended family. In addition, Mr. Gles has demonstrated remorse for his actions and has a low probability of committing any future crimes. While in detention, he has renewed his faith and recognized that his crime was an affront not only to the community, but also to his religion. He is the imam for a group of Muslims also in the Metropolitan Detention Center ("MDC") and leads them in daily prayer.

**A.    Mr. Gles' Incarceration Already Has Caused Considerable Harm To His Family And The Longer He Remains Incarcerated The More His Family Will Be Harmed.**

Although "[f]amily ties and responsibilities are not ordinarily relevant in determining whether [a sentence should be outside the Guidelines range]," (U.S. Sentencing Guidelines Manual § 5H1.6) extraordinary circumstances permit consideration. *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004). Courts in this district have made clear that factoring in "extraordinary family circumstances is not intended to reduce the culpability [of] the defendant; its rationale is to 'avoid wreak[ing] extraordinary destruction on dependents who rely solely on the defendant for their upbringing.'" *Id.* If "incarceration in accordance with the

8

Guidelines might well result in the destruction of an otherwise strong family unit" a sentence outside of the Guidelines is appropriate. *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991).

Courts in this Circuit have imposed a sentence outside of the Guideline range when a defendant plays a critical role in the lives of his or her family members. *See United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992); *Alba*, 933 F.2d at 1122; *see also United States v. Tineo*, No. 99 CR 948 (RWS), 2000 WL 759837, at *1 (S.D.N.Y. June 12, 2000) (finding that, where defendant was a single mother of three children under the age of seven and also the sole source of financial support, a downward departure was appropriate); *United States v. Greene*, 249 F. Supp. 2d 262, 267 (S.D.N.Y. 2003) (holding that when the "defendant is the sole financial and emotional support for children in . . . desperate need of some stability [a downward departure] is warranted when viewed in isolation."). In addition, courts recognize that where a defendant is separated from his family, it increases the defendant's suffering. *United States v. Torres Teyer*, No. 01 CR. 21 (GEL), 2006 WL 3511885, at *7 (S.D.N.Y. Dec. 6, 2006) ("Undoubtedly, being cut off from contact with loved ones would increase the suffering that accompanies imprisonment, and is therefore relevant to the severity of the sentence imposed.").

In *Alba*, the defendant was charged with conspiracy to distribute and possession with the intent to distribute cocaine. 933 F.2d at 1119. The defendant had been married for twelve years and had two young daughters with his wife. His wife and daughters lived with the defendant's disabled father who depended on the defendant to assist him into and out of a wheelchair. *Id.* at 1122. The court downwardly departed because the defendant's "incarceration would result in the destruction of the family whose strength and stability primarily depended" upon the defendant. *Id.* at 1121.

9

Mr. Gles' wife has lupus. Her condition is recurrent and leaves her unable to maintain consistent employment. The part-time jobs she is able to find are not enough to support her and her medical expenses. Mr. Gles was both her primary caregiver and her primary means of financial support. (Exh. F, Tracey Oppong Letter) ("Since Abass has been gone, I have faced so many hardships....It is very difficult for me, because he was the only one that was there for me. I deal with this struggle all the time by myself, and the harder it gets for me, the more my sickness appears.").

Mr. Gles also is the primary supporter for his family in Ghana. When in Ghana, Mr. Gles did not enroll in college because he had to work to support his younger brother and sister. He also supported his mother, whose epilepsy makes it difficult to earn enough to sustain the family. (Exh. D, Jazatu Adamu Letter) ("[Abass] takes care of his younger brother and sister's school fees. He also sends me money to take care of the family since the business I do does not bring enough income to take care of the family."); (Exh. C, Abass Gles Letter, at pp. 2-3) ("I traveled to the United States to work hard and be able to take care of my family back home. I have been the sole provider for my mother and siblings all these years as far as food, shelter, medical bills, and tuition are concerned."); (Exh. F, Tracey Oppong Letter) ("Ab (as the family calls him) was not only taking care of me, but he was also the sole provider for his own family. He would take care of his family back home [in] Ghana due to the early demise of his father. He was forced to be head of household for 2 families."); (Exh. G, Mohammed Misbawu Letter) ("He helped our mother to pay our school fees after we lost our Father. He pays my fees every semester and takes care of all my needs."); (Exh. I, Rabi Karimu Letter) ("Mr. Gles has been the sole provider of his sick mother and younger siblings. He paid for his siblings to attend school"); (Exh. L, Hasiya Abubakari Letter) ("Being the eldest son of his mother, and the only

one who was in the United States of America, Mr. Gles was the only bread [winner] of his family. He has one sister and one brother who depend on him. His father [] passed away years ago and therefore he has taken his father's position of providing for the family."); (Exh. M, Shabami Adamu Letter) ("Abass is the one that takes care of his mother and his other siblings. His mother is a very sick woman."); (Exh. N, Zena Atanga Letter) ("[A]t an age when most people his age were going to school, he had to become the sole breadwinner of the family, taking care of not only his mother and little brother and sister but also some extended family as is common with our culture.").

Mr. Gles' incarceration has left his family in Ghana struggling. Without Mr. Gles' remittances, his brother and sister cannot afford college. Mr. Gles' brother, Mohammed Misbawu, had been attending university while Mr. Gles was able to pay the fees for his attendance. Since Mr. Gles' arrest, Mr. Misbawu has been forced to defer his studies because he cannot afford the fees. Mr. Gles' sister, Mohammed Sharifa, has completed high school but also cannot attend university because the family cannot afford to pay her fees without Mr. Gles' financial assistance. (Exh. G, Mohammed Misbawu Letter) ("He [Mr. Gles] helped our mother to pay our school fees after we lost our Father. He pays my fees every semester and takes care of all my needs.").

**B.      Mr. Gles' Incarceration Has Had A Serious Negative Impact On His Extended Family And Friends In the United States.**

When Mr. Gles moved to the United States, he joined his extended family in New York and New Jersey. Mr. Gles is an important part of this support network and he is sorely missed. Mr. Gles was a role model for his family and friends both because of his general devotion to them and because he championed excelling in school. (Exh. H, Nasir Alabi Letter) ("Abass is the [b]ig brother I never had, he has always been here for me. When I was in 5[th]

11

grade he would help me with mat[h]ematics, because I wasn't really good at it. After a while

with his help it became easier for me, and I would also pass my exams."); (Exh. I, Rabi Karimu

Letter) ("Abass Gles is a very family oriented person and he's been in [his cousins'] life

regularly. They had a very good relationship and always want to go for the weekend at his place.

He used to come help them with their homework[s] whenever he had the chance, take them to

the movies, take them to the mosque to pray amongst other things. He helped brought unity in

our family living here in the United States."); (Exh. K, Shaida Karimu Letter) ("Abass always

stressed that education comes first, and it is the only thing that's going to get me through life.");

(Exh. N, Zena Atanga Letter) ("Even now, he still encourages me to try to go to college in [the]

letters he writes."); (Exh. J, Yahiya Abdullah Letter) ("My cousin is a very good man. He is a

caring, kind and loving person and also he is respectful. Abass is the type of person a child

would take as a role model."); (Exh. L, Hasiya Abubakai Letter) ("[Abass] has been a motivation

factor in my life especially when I had problems with my step mom and didn't have anybody to

turn to. He also helped me to get my first job and encouraged me to go back to school to further

my education.")

   Mr. Gles has been a positive role model for his cousins and friends. His support –

including his emphasis on the importance of education – is impossible to replace. It is clear in

the letters from his family and friends that Mr. Gles plays a central role for his family, both in the

United States and in Ghana. Mr. Gles wants again to play that central role. (Exh. C, Abass Gles

Letter, at p. 7) ("I am somebody who wants to be out there and provide help to others, even if it

is not financially, I can give physical and emotional support.").

12

C.    **Mr. Gles Has Demonstrated Remorse For His Actions And Is Not Likely To Commit A Crime In the Future.**

Mr. Gles has demonstrated clear remorse and understanding of the harm he has caused. (Exh. C, Abass Gles Letter, at p. 1) ("I am deeply sorry for my crimes and if I had to do it all over again, I'll do things differently."). Mr. Gles has accepted his guilt and deeply regrets his actions. (*Id.*, at p. 5) ("I took part in this immoral act and [k]new exactly that what I was doing was bad. My intentions was to save some money to solve some of my problems but I still felt very uncomfortable with myself. I hid it from my family and friends.").

Not only is Mr. Gles remorseful, but his entire extended network of family and friends share that remorse. Mr. Gles has made it clear to all who know him that he regrets what he has done. (Exh. F, Tracey Oppong Letter) ("I know by [now] this all sound[s] all too familiar to you [Your Honor], but please believe me when I tell you that if given the opportunity and the chance you will see that he is a humble young man with a promising future. Abass has definitely learned his lesson."); (Exh. D, Jazatu Adamu Letter) ("He has really regretted what he did...."); (Exh. N, Zena Atanga Letter) ("In his letters, a now older and wiser Abass expresses his regret and wishes he could un-do his wrongs."); (Exh. G, Mohammed Misbawu Letter) ("I believe my brother has learnt his lessons well and will never get involve[d] in this kind of immoral act for the rest of his life.").

As part of such an intimately connected extended family, Mr. Gles feels strongly that he must not let his family down again. "I have brought so much pain and disgrace to the same people I was trying to help." (Exh. C, Abass Gles Letter, at p. 6). He does not want to cause his family any more pain. Mr. Gles plans to return to work and school.

Mr. Gles hopes to become a radiologist. (PSR at ¶ 48) (Mr. Gles "was enrolled in school in the Fall 2005 semester and completed 9 credits with a 1.37 GPA. He was also enrolled

in the Spring 2007 semester, but does not appear to have earned any credits. It is noted that Gles was incarcerated as of January 2007. Gles added that he would like to resume his studies in [the field of radiology] in the future.").

Mr. Gles makes no excuses for his crime, but the circumstances that led him to do what he did indicate the kind of man that he is: Mr. Gles was a good student as a child but he could not enroll in college in Ghana because he had to support his family. As soon as he had saved enough money in the United States, he began taking classes at Essex Community College in New Jersey. Mr. Gles was not eligible for financial aid. Tuition became one more bill in a long list of financial obligations. Mr. Gles was struggling to pay his own tuition, to support his wife and her medical expenses, to pay his mother's bills, and to cover his younger brother and sister's tuition back in Ghana, all on a very limited salary. The combination of these responsibilities led him to make the misguided "desperate choice" to break the law in order to make extra money to meet all his financial obligations. (Exh. C, Abass Gles Letter, at p. 5).

## D.    Serving The Two Year Mandatory Sentence Meets The Goals Of Just Sentencing.

The goals of sentencing—retribution, deterrence, incapacitation, and rehabilitation—are served by sentencing Mr. Gles to the mandatory sentence of two years. Mr. Gles wants to become a productive member of society and to return to his role as a loving and supportive husband, son, and brother. "I am absolutely ready to go out and face the world as a better person with a promising future. . . . You don't have to worry about seeing me in your court again." (Exh. C, Abass Gles Letter, at pp. 7-8). Mr. Gles has reflected on his crime and realizes that the choices he made in the past were both immoral and a bad way to help his family. Mr. Gles' family and friends expect from Mr. Gles what he expects from himself: to live a crime-free life and to be a productive member of society.

14

Given Mr. Gles' remorse for his conduct, his willingness to cooperate, and his desire to lead a productive life, the factors of § 3553(a)(2)(A)–(C), including the seriousness of the offense, respect for the law and just punishment for the offense, are all satisfied by his mandatory two-year sentence. In the alternative, imposing a six-month sentence of home detention for the violations of 18 U.S.C. § 1349 and 18 U.S.C. § 1029(b)(2), in addition to the mandatory minimum required by 18 U.S.C. § 1028A, would serve justice while allowing Mr. Gles to find work and begin supporting his wife in the United States and his mother, brother and sister in Ghana.

## CONCLUSION

Mr. Gles has learned that no financial pressures justify crime. Mr. Gles has re-committed himself to pursuing his education, becoming a productive member of society, a reliable provider for his family, and a role model for his younger cousins and friends.

For the reasons set forth above, defendant Abass Gles respectfully requests that the Court sentence him to the mandatory sentence of twenty-four months required by § 1028A. In the alternative, Mr. Gles requests that the Court sentence him to a sentence of six months of home detention after serving his mandatory minimum of twenty-four months.

Dated: New York, New York
April 7, 2008

Respectfully submitted,

Linklaters LLP

By:    /s/ D. Alison von Rosenvinge
       Lance Croffoot-Suede (LC-3725)
       D. Alison von Rosenvinge (DR-6229)
       Jared R. Jenkins (JJ-0531)
       1345 Avenue of the Americas
       New York, NY 10105
       (212) 903-9000
       (212) 903-9100 (fax)

15

*Attorneys for Defendant Abass Gles*